inute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 CR 1106 - 1, 2 | DATE | 11/24/2004 |
| CASE TITLE | USA vs. Richard Zerth and Barbara Zerth | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The Zerths' motion for judgment of acquittal (Doc. Nos. 46-1, 48-1, 56-1) and motion for new trial (Docket No. 56-2) are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 2 9 2004 | |
| | Notified counsel by telephone. | | date docketed | 63 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | 11/24/2004 | |
| ETV | courtroom deputy's initials | 2004 NOV 24 PM 2:56 | date mailed notice ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 03 CR 1106 |
| RICHARD ZERTH and BARBARA ZERTH, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Richard and Barbara Zerth were jointly charged with, and convicted of two counts of mail fraud and two counts of submission of false ERISA documents in connection with their roofing contractor business. 18 U.S.C. §§ 1027 and 1341. Specifically, a jury found that the Zerths had engaged in a scheme to defraud the pension, health and welfare, and apprenticeship and training funds (the "Trust Funds") of the Chicago and Northeast Illinois District Council of Carpenters Union (the "Carpenters Union") by creating a sham corporation that allowed them to hide the number of employees performing union work and to deprive the Trust Funds of fringe benefit contributions required by the Carpenters Union collective bargaining agreement ("CBA"). The government charged that mailings of Fringe Benefits Funds Reports on December 7 and 21, 1998 were in furtherance of the scheme to defraud. The Zerths now seek a judgment of acquittal or a new trial. For the reasons set forth here, the motions are denied.

## BACKGROUND

The following is a summary of facts adduced at trial, presented in a light most favorable to the jury's verdict. *United States v. Moore*, 363 F.3d 631, 634 (7th Cir. 2004). Richard Zerth was the president and majority owner of Roof Right Roofing and Insulation Co. ("Roof Right"), a family operated roofing contractor that installed roofs, insulation, and siding on new homes for large residential developers in the Chicagoland area. As a long-time signatory to the Carpenters Union

CBA, Roof Right was required to make fringe benefit contributions to the Trust Funds for each union-covered employee hour worked. 29 U.S.C. § 1145. Barbara Zerth, Richard's wife, held herself out as a vice president of Roof Right in charge of running the company's administrative functions. These included payroll, bookkeeping, hiring of administrative employees, and insurance and employee benefit matters. Barbara was responsible for preparing and mailing the monthly Fringe Benefits Funds Reports identifying the total hours worked by each roofing, siding, and insulator employee, and for paying to the Trust Funds the required contributions based on those hours.

### A. Roof Right's Payment System

Rather than using time cards to record the actual hours worked by each employee, Roof Right paid its roofers on a "piece-rate" basis.[1] Under that system, employees were compensated based on the number of shingles (or "squares") installed. To calculate the number of hours worked for purposes of computing the amount of fringe benefit contributions owed to the Trust Funds, Barbara Zerth divided the workers' gross wages (determined by the piece-rate) by the union's hourly wage rate. Barbara's calculations generally resulted in Roof Right's reporting that employees worked fewer hours than they actually did.

### B. K&K Supply Co.

To evade Roof Right's obligations to make fringe benefit contributions under the CBA, in September 1994, the Zerths established a non-union company, K&K Supply Co. ("K&K"), and used it to conceal approximately one-third of its payroll from the Carpenters Union. K&K, which was not a signatory to the union contract, effectively existed only on paper. Its sole purpose was to provide non-union roofing, siding, and insulation labor to Roof Right projects. K&K provided no supplies

---

[1] Some employees, such as insulators, were paid by the hour, but at a rate far below the union scale.

2

and had no inventory, materials, or equipment. It also had no independent business or contracts. Instead, all of K&K's revenues came from Roof Right, which funded K&K's payroll.

Richard Zerth and his brother Donald Zerth, who was a minority shareholder and officer of Roof Right, were the sole owners of K&K. Richard controlled and operated the company in the same manner as Roof Right. Richard's sons, Kevin and Kenneth Zerth, were installed as officers of K&K but had nothing to do with its operation or control; both men were primarily truck drivers delivering materials to Roof Right job sites. Nevertheless, Kevin's home address was listed with the Illinois Secretary of State as the address of K&K. The Zerths' accountant, William Condon, warned them against creating an alter ego company, but after reviewing K&K's accounting records for the first full year of operations, he concluded that K&K was exactly that.

### C. The Scheme to Defraud

The Zerths engaged in several practices designed to conceal the fact that K&K was merely Roof Right's alter ego. First, Richard Zerth instructed his comptroller, Kenneth Novak, to create false invoices indicating that K&K was providing "materials" to Roof Right. This, in turn, justified Roof Right's issuance of checks to K&K for the purpose of funding K&K's payroll. In addition, the Zerths issued misleading paychecks to their employees in order to confuse them as to their true employer. Specifically, employees who were paid out of K&K's payroll account received checks without any company name on them. The Zerths told Mr. Condon that they wanted the K&K name kept off the checks so the company could remain "low key" and avoid labor strife. Barbara also admitted to Novak that the Zerths wanted to prevent the employees from knowing which company was paying their salary.

As a further part of this scheme, the Zerths issued misleading W-2 wage forms to their employees. For the 1995 tax year, Barbara created W-2 forms that left the employer name blank but used K&K's Federal Employer Identification Number ("FEIN"). A number of employees and

3

their tax preparers contacted Barbara for clarification as to the proper employer, so for the 1996 tax year, the Zerths ordered Novak to create W-2 forms that identified Roof Right as the employer but used K&K's FEIN. For the 1997 tax year, after officials of the Carpenters Union began having suspicions about K&K, the Zerths gave employees two W-2 forms – one in the name of K&K, and one in the name of Roof Right. Concealing the identity of K&K from the workers assisted the Zerths in their efforts to hide the existence of K&K from the Carpenters Union. Significantly, while the Zerths were submitting misleading W-2 forms to their employees, they also directed Novak to file a second set of "correct" forms with the Internal Revenue Service. The IRS forms always identified K&K as the employer and used K&K's corresponding FEIN.

Richard and his brother Donald also took steps to prevent K&K workers from joining the Carpenters Union. Both men threatened workers with termination if they joined the union and actually ordered K&K workers to hide from the union representatives who came to job sites to verify that workers on roofing projects were union members. One worker hid in a box for approximately three hours to avoid a union agent at a Roof Right job site. Ron Schabes, a long-time foreman with the Zerths, also discouraged workers from joining the union and warned them that even though they performed roofing work covered by the CBA, they did not hold the job title of "roofer."

### D. The Union Learns of K&K

In the latter half of 1997, the Carpenters Union received information regarding the existence of K&K from workers who supplied the union with the misleading W-2 forms and payroll checks. By September 1997, Carpenters Union officials asked the Trust Fund auditors to re-open the audit of Roof Right's 1995-1996 payroll. When Roof Right refused to turn over any records relating to K&K, the Trust Funds filed a civil lawsuit in November 1997 seeking K&K's books and records for purposes of conducting its 1995-1996 audit. In response to formal document requests in that lawsuit, Barbara Zerth finally gave K&K's payroll records to the Trust Funds in February 1998.

In late January 1998, however, while that lawsuit was pending, Richard Zerth, Barbara Zerth, Donald Zerth and Ron Schabes compelled some 30 roofing, siding, and insulating employees to sign false affidavits stating that they worked for K&K between 1995 and 1996 and that they did not perform any duties covered by the CBA. Some of the workers did not read or speak English; they nevertheless signed these affidavits, written in English, under threats that they would lose their jobs or not get paid. One former worker testified that Donald Zerth held the worker's paycheck behind Donald Zerth's back and told the worker that he must sign the affidavit if he wanted his paycheck. Despite these tactics, the workers believed that they always performed union-covered work on behalf of Roof Right.

On March 31, 1998, Barbara gave the affidavits to the Trust Funds' auditors. Primarily due to the Zerths' activities with respect to K&K, the auditors concluded that Roof Right owed additional contributions for 1995-1996. The parties reached a settlement agreement and the case was dismissed in November 1998. Sometime after the settlement, Novak asked Richard Zerth why he did not just comply with the union agreement and pay the union wage scale. Richard responded that there were only a few union contractors in a "sea" of non-union contractors, that he was not afraid of the union, and that he would have no problem setting up six companies like K&K. Around the same time, Barbara and Donald Zerth had a conversation with Novak in which Donald said that he was fed up with the situation and that Roof Right should just pay the union the money it was owed; Barbara replied that Richard had no intention of making such a payment. On another occasion, Novak advised Donald that Roof Right should comply with the CBA, but Donald said that his brother was too stubborn and would not do it.

E.     The March 23, 1998 Letter

While the civil lawsuit was pending, Richard Zerth sent a letter to the Carpenters Union dated March 23, 1998 claiming that he was terminating Roof Right's participation in the CBA. The

evidence presented at trial, however, suggested that the Zerths nevertheless intended to hold Roof Right out as a union employer. As evidenced by a July 22, 1998 DRZ Financial Report prepared by Mr. Condon, the Zerths never told their accountant that they intended to withdraw from the CBA. In that report, which was an independent auditor's report relied upon by Roof Right's banks and lenders, Mr. Condon stated that substantially all of the non-management employees were covered by collective bargaining agreements. He further reported that "the agreements with the various unions are scheduled to expire from June 1998 through May 2001. If the Company and the unions are unable to agree on new contracts prior to expiration of the current contracts, a work stoppage may occur that could adversely affect results of operations."

According to the government, the Zerths needed Roof Right to continue as a signatory to the CBA to avoid major disruption to operations, and they had no intention of renouncing Roof Right's union status. Rather, Richard Zerth sent the letter "to lull the union and force a favorable audit settlement." (Gov't Resp., at 16.)[2] The government notes that although the letter announced a withdrawal from the agreement between the Union and the roofers' association, the letter also suggests an intent to continuing bargaining: "No association holds our bargaining rights. We will therefore be bargaining on an individual company basis." (Ex. 1 to Gov't Resp.) In addition, the evidence at trial established that the Zerths never informed their customers that Roof Right had withdrawn as a signatory to the CBA. To the contrary, developers, some of whom desired only union roofers, continued to assume that Roof Right was a union company and to pay Roof Right for its work on union projects.

F.     The October 20, 1998 Letter

Shortly after Richard Zerth sent the March 23, 1998 letter, Roof Right's labor negotiator, Fred Hayes, told the Trust Funds' labor attorney, Terrence McGann, that Roof Right intended to

---

[2]     The Government's Consolidated Response to Defendants' Motions for Judgment of Acquittal and for a New Trial is cited as "Gov't Resp., at __."

remain a union employer and to abide by the terms of the CBA. The Zerths now contend, however, that Roof Right had no such intention and instead negotiated and entered into a new contract with the Carpenters Union in October 1998. (Def. Mem., at 5.)[3] By letter dated October 20, 1998, Hayes confirmed an October 13, 1998 Memorandum of Agreement between Roof Right and the union to abide by the terms of the existing CBA. (*See* Memorandum of Agreement, Ex. B to Def. Mem.)

As part of the October 13 agreement, Richard Zerth agreed either to shut down K&K or to start reporting amounts paid to K&K's workers on the monthly Fringe Benefits Funds Reports beginning October 19, 1998. Specifically, Hayes wrote:

> New Hire Forms – Roof Right will fill out new hire forms starting October 19th for new employees as well as Non-Union employees currently working within the Union's jurisdiction.

(Letter from F. Hayes to T. Shipley of 10/20/98, Ex. C to Def. Mem.) The Zerths did cease the operation of K&K in October 1998 and did not pay any more workers from a K&K account after the October 19 deadline. Indeed, Darren Udaykee, an auditor hired by the Trust Funds, testified that K&K did not issue any payroll checks for work performed after October 16, 1998.

The government points out that Roof Right did not actually negotiate any of the CBA's established terms prior to re-signing essentially the same agreement on October 13. The government also notes that the Zerths continued to perpetrate the fraud against the union after that date by refusing to give the Trust Fund auditors K&K's payroll records for 1997-1998. The auditors were not able to uncover the fraud relating to those years until, in response to another civil lawsuit filed by the Trust Funds, Barbara turned the records over in the latter half of 1999.

---

[3] Defendants' Joint Motion for Judgment of Acquittal or in the Alternative Motion for New Trial is cited as "Def. Mem., at ___."

G. The Jury Verdict

On July 12, 2004, a jury convicted the Zerths of two counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of submitting false documents required under ERISA in violation of 18 U.S.C. § 1027. The jury found that the Zerths had engaged in a scheme to defraud the Trust Funds from September 1994 through December 21, 1998 by paying union workers from K&K accounts and then failing to report their hours in making fringe benefit contributions. Count One alleged that the Zerths knowingly mailed a false Fringe Benefits Funds Report on December 7, 1998, which underreported the hours worked and the contributions due for September 1998. Count Two alleged that the Zerths knowingly mailed a false Fringe Benefits Funds Report on December 21, 1998, which underreported the hours worked and the contributions due for October 1998. The jury also found the Zerths guilty of making false statements or omissions of fact in violation of 18 U.S.C. § 1027 by failing to report the hours worked by K&K employees in the September and October 1998 fringe benefit reports.

The Zerths now seek a judgment of acquittal or, in the alternative, a new trial. They first claim that the evidence was insufficient to prove that the September and October 1998 Fringe Benefits Funds Reports were false, or that they knew the reports were false. Even if the evidence was sufficient, the Zerths argue, they were unfairly prejudiced by the government's attempts to admit evidence of other bad acts, and by an improper jury instruction.

## DISCUSSION

I. Motion for Judgment of Acquittal

A motion for judgment of acquittal is appropriate where "the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). In considering such a motion, the court must view the evidence "in the light most favorable to the government . . . and will uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

8

doubt.'" *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003) (quoting *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir. 1998)) (emphasis in original). "Proving that no such evidence [of guilt beyond a reasonable doubt] exists presents a nearly insurmountable hurdle to the defendant." *Id.* (quoting *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998)).

### A. False Reports

The Zerths argue that there is no evidence that the September and October 1998 monthly reports were false "in light of the negotiations and agreements between Roof Right and the Union." (Def. Mem., at 6.) The Zerths claim that pursuant to the October 13, 1998 Memorandum of Agreement, Roof Right was only required to report K&K employee hours as of October 19, 1998. The September and October 1998 Fringe Benefits Funds Reports were covered by the October 13 agreement, the Zerths argue, because they were not due until October 15 and November 15, respectively. (Def. Mem., at 7; Def. Reply, at 2-3.)[4] Thus, according to Defendants, they fairly relied on that agreement when they omitted information about K&K employees from the September and October 1998 reports, and "did not hold an intent to defraud the Trust Funds." (Def. Mem., at 7; Def. Reply, at 4.) In support of this argument, the Zerths point to the October 20, 1998 letter from Roof Right's labor negotiator, Fred Hayes, to the Carpenters Union which, they say, granted Roof Right a "grace period to stop using non-union, K&K workers and comply with the standard CBA terms." (Def. Reply, at 3.)

The government claims that the Hayes letter "provides absolutely no rational explanation to negate the otherwise overwhelming evidence of false statements made to the Trust Funds and fraudulent intent on the part of both defendants." (Gov't Resp., at 22.) In the government's view, regardless of whether Roof Right was a signatory to the Carpenters Union CBA as of May 1998, the Zerths' actions and course of conduct "left no doubt that Roof Right continued to be bound by

---

[4] Defendants' Joint Reply to the Government's Response to their Motion for Judgment of Acquittal is cited as "Def. Reply, at __."

the terms of the [existing] CBA and that defendants knew of that obligation but yet continued to perpetrate the fraud throughout the alleged termination/negotiation period." (*Id.* at 19.) *See also Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) ("[e]mployers may adopt a collective bargaining agreement by a course of conduct").

The court is satisfied that there was ample evidence presented at trial from which the jury could have concluded that the Zerths knew they were bound by the terms of the CBA notwithstanding the October 13 agreement. Shortly after Richard Zerth sent his March 23, 1998 letter withdrawing from the CBA, Hayes told the Trust Funds' labor attorney that Roof Right intended to remain union and to abide by the terms of the CBA. The jury heard testimony that Roof Right needed to be union in order to work on new residential development projects; that the Zerths never informed the new residential developers about the withdrawal; and that the developers continued to pay Roof Right for its union work. The government also presented evidence that the Zerths failed to notify their own accountant of their purported intent to withdraw from the CBA. In a July 22, 1998 DRZ Financial Report, Mr. Condon stated that substantially all of Roof Right's non-management employees were covered by collective bargaining agreements, and expressed concern about a work stoppage if Roof Right and the union could not agree on new contracts before those agreements expired, which he asserted would occur on dates "from June 1998 through May 2001."

In addition to keeping the withdrawal a secret from developers and from Mr. Condon, the Zerths continued to submit monthly payroll reports and fringe benefit contribution payments as required by the CBA. When the Zerths finally signed the Memorandum of Agreement on October 13, 1998, moreover, they agreed to essentially the same terms as the previous CBA without engaging in any negotiation. The only difference, memorialized in Hayes's October 20, 1998 letter, was that Roof Right was required to cease K&K's operations and to "fill out new hire forms starting October 19th for new employees as well as Non-Union employees currently working within the

10

Union's jurisdiction." (Ex. C to Def. Mem.) The Zerths claim that this led them to conclude that they did not have to report K&K employees in the September or October 1998 Fringe Benefits Funds Reports. (Def. Reply, at 4.)

Given the evidence that the Zerths needed to remain union to keep their roofing business and never intended a genuine withdrawal from the CBA, a jury could reasonably have concluded that the Zerths knew they were obligated to report the K&K employees but used the Hayes letter as an excuse to continue defrauding the Trust Funds. Indeed, the jury heard testimony that in January 1998, the Zerths coerced employees to sign false affidavits stating that they were performing non-union work on behalf of K&K; that the Zerths submitted those false affidavits to the Trust Funds' auditors eight days after Richard sent his March 23 letter purporting to withdraw from the CBA; that the Zerths refused to disclose any information relating to the K&K scheme until forced to do so in litigation; and that Richard Zerth told Barbara and Donald that he had no intention of paying the union the money it was owed and would have no problem setting up six sham companies to avoid such payments.

There is ample evidence that the Zerths intended to cheat the Trust Funds and abused their employees, some of whom could not read the affidavits the Zerths required them to sign, to carry out the fraud. It is disappointing that the government waited so long to indict the Zerths and that the Hayes letter is even relevant here.[5] Nevertheless, the letter was admitted as evidence at trial and the Zerths had an opportunity to argue their theory that it negated both their obligation to report the K&K workers in the September and October 1998 monthly reports, and their intent to defraud. The jury could reasonably have rejected such a theory on the evidence presented and, thus, the

---

[5] The indictment was filed on November 20, 2003; the government therefore could not charge the Zerths with any misconduct occurring before December 1998. See 18 U.S.C. § 3282 (setting forth five-year statute of limitations on mail fraud); *United States v. Rumsavich*, 313 F.3d 407, 413 n.2 (7th Cir. 2002) (quoting *United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999)) ("[t]he federal mail fraud statute has a five-year statute of limitations that 'begins to run from the date of mailing of the fraudulent information'").

Zerths have not met the heavy burden required for a judgment of acquittal. *Fassnacht*, 332 F.3d at 447.

### B.   Use of the Mails

The Zerths argue that a judgment of acquittal is nevertheless appropriate on the two mail fraud counts because the government failed to prove beyond a reasonable doubt that the September and October 1998 Fringe Benefits Funds Reports were mailed to the Trust Funds. *See United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004) (mail fraud conviction requires a showing that defendants "use[d] . . . the mails in furtherance of the fraudulent scheme"). The Zerths note that the government did not present testimony from anyone at the Trust Funds who received the December 7 or 21, 1998 mailings, nor did it offer into evidence the actual mailed envelopes.  (Def. Mem., at 8.)  The Zerths find this significant because Kathleen Newell, the Contributions Department audit clerk for the Trust Funds, testified that one of the other audit clerks often made mistakes, and that the Trust Funds usually retained envelopes for late payments to substantiate late fees, but apparently did not do so for the two payments at issue here. (*Id.* at 8-9.)

Contrary to the Zerths' suggestion, the government was not required to produce the actual post-marked envelopes or the person who received the mailings in order to establish use of the mails.  "It has long been held that testimony regarding standard office practice is sufficient circumstantial proof of the use of mails, so long as the circumstances proven directly support the inference and exclude all reasonable doubt to the extent of overcoming the presumption of innocence." *United States v. Genova*, 167 F. Supp. 2d 1021, 1039 (N.D. Ill. 2001), *aff'd*, 333 F.3d 750 (7th Cir. 2003).  *See also United States v. Keplinger*, 776 F.2d 678, 690 (7th Cir. 1985) ("[t]he use of the mails may be proved by direct or circumstantial evidence").  Ms. Newell testified that it was the Trust Funds' standard practice to have collection personnel input into a computer exactly how the Trust Funds received the monthly Fringe Benefits Funds Reports and contributions: by

12

mail at the Trust Funds' office, by mail at the Trust Funds' U.S. postal service box ("lock box"), or by hand delivery. At trial, the government produced computer records showing that the Trust Funds received Roof Right's September 1998 report and contribution payment via U.S. mail at the Trust Funds' office, and received the October 1998 report and contribution payment via U.S. mail at the Trust Funds' lock box.

The Zerths acknowledge Ms. Newell's testimony that her review of the Trust Fund computer file showed that the September and October 1998 monthly benefits forms were received by mail. In their view, however, such an "unverified computer entry, possibly entered by an unreliable worker, cannot amount to proof beyond a reasonable doubt of this essential element of the offense of mail fraud." (*Id.* at 9.) The court disagrees. The Zerths had an opportunity at trial to challenge Ms. Newell's credibility and to attack the reliability of the Trust Funds' record keeping system. The jury reasonably resolved both issues in favor of the government. *See United States v. Waagner*, 319 F.3d 962, 964 (7th Cir. 2003) (in deciding a sufficiency of the evidence argument, the court "defer[s] to the credibility determination of the jury"). The Zerths' motion for a judgment of acquittal is therefore denied.

II.     Motion for New Trial

The Zerths' motion for a new trial is based on two alleged errors: (1) unfair prejudice from the government's attempts to introduce evidence of other bad acts; and (2) an improper jury instruction. A court may grant a new trial "if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999); FED. R. CRIM. P. 33. "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990); *United States v. Jenkins*, 218 F.R.D. 611, 613 (N.D. Ill. 2003) (motions for a new trial "are disfavored, and properly granted only in the most extreme cases").

### A. Evidentiary Error

The Zerths claim that the government committed reversible error by twice referring to inadmissible evidence. First, in its opening statement, the government noted that the Zerths had set up a new company, Advance Roofing, after the Trust Funds' audit had disclosed the existence of K&K. In addition, during the direct examination of witness Larry Miller from Burnside Construction, the government elicited testimony that Roof Right had used non-union workers during the fall of 1999 (presumably through Advance Roofing), a period of time not involved in the indictment. On both occasions, the court instructed the jury to disregard the improper references, but the Zerths insist that "[t]he bell could not be unrung by the Court sustaining objections to these matters." (Def. Mem., at 9.)

The government denies that its reference to Advance Roofing was improper, claiming that it had a reasonable belief that the evidence would be admitted at trial. (Gov't Resp., at 25-26.) The government notes that it gave prior notice of its intent to introduce evidence relating to Advance Roofing in its *Santiago* proffer, and that the Zerths never raised any objections until the opening statement. (*Id.* at 26.) The government also disputes that the evidence regarding Advance Roofing constituted Rule 404(b) bad acts evidence. FED. R. EVID. 404(b) ("[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith"). In the government's view,

> it was evidence that involved, explained the circumstances surrounding, and tended to prove an element of the charged crime and was thus intricately related, connected, and intertwined with the charged crime, and thus was properly excluded from the prohibition against other acts evidence in Rule 404(b) and was admissible without regard to the requirements of that Rule.

(Gov't Resp., at 26) (citing *United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002) (admitting other acts evidence where it clarified the timing of events and completed the story of the crime at issue).) Specifically, the statement regarding the creation of Advance Roofing "was intended to

complete the story of the case on trial" in light of Richard Zerth's assertion to Ken Novak that he would set up six sham companies like K&K. (Gov't Resp., at 27.) With respect to Larry Miller, the government notes that he testified merely to learning of Roof Right's use of non-union labor in the "fall of 1999." He never mentioned Advance Roofing by name and the court sustained the Zerths' objection to further testimony regarding Roof Right's actions in 1999. (*Id.* at 27-28.)

The court does not believe that either evidentiary reference constituted reversible error. The Zerths knew that the government intended to introduce evidence regarding Advance Roofing a month before the trial but made no objection at that time. When the government mentioned Advance Roofing in its opening statement, the court immediately sustained the Zerths' objection and admonished the jury to disregard the reference. The court further instructed the jury that opening statements are not evidence. *See United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003) (assuming prosecutor's statements during opening statement, closing argument, and at sentencing were improper, defendant was not denied a fair trial where the judge gave a standard instruction reminding the jury not to consider attorneys' arguments as evidence); *United States v. Chaney*, 165 F.3d 33 (Table), 1998 WL 789891, at *3 (7th Cir. 1998) (quoting *United States v. Moore*, 115 F.3d 1348, 1358 (7th Cir. 1997)) ("'we presume that the jury understood and followed the court's limiting instructions,' . . . and thus errors that are the subject of correct instructions to the jury are presumed harmless"). The Miller statement was similarly harmless given that he never mentioned Advance Roofing by name and the court again sustained the Zerths' objection. As the court noted in denying the Zerths' motion for a mistrial, "I didn't hear any mention of Advance, and I sustained the objection." (Gov't Resp., at 28.) The Zerths have not demonstrated that they suffered any prejudice from these two incidents and have not established that a new trial is necessary in the interest of justice.

## B. Jury Instruction Error

Finally, the Zerths claim that the court committed reversible error by giving the following instruction to the jury:

> To sustain any of the four charges in the indictment, the government must prove beyond a reasonable doubt that Roof Right was bound by the ongoing terms of the collective bargaining agreements with the union and that the defendant knew that he/she was required to file Fringe Benefit Contributions Reports. An employer may be bound by a collective bargaining agreement by his course of conduct. The government must prove the existence of the agreement and the defendant's knowledge of his/her obligations under that agreement. Whether defendant agreed to be bound and whether the defendant knew of his/her obligation are matters for you to decide, based on the facts and circumstances of this case.

(Def. Mem., at 9-10.) The Zerths argue that "[f]or all of the reasons argued by counsel during the jury instructions conference, this Court should have provided Defendants' Instruction No. 4 instead." (Id. at 10.) Defendants' Instruction No. 4 stated:

> To sustain any of the four charges in the indictment, the government must prove beyond a reasonable doubt that Roof Right was a signatory to and agreed to be bound by collective bargaining agreements with the union and that the defendant knew that he/she was required to file Fringe Benefit Funds Reports pursuant to a collective bargaining agreement.

(Gov't Resp., at 30.)

As the court understands their argument, Defendants contend that the court erred in failing to instruct the jury that the government was required to prove that Roof Right "was a signatory" to the collective bargaining agreements. During the instructions conference, however, Defendants acknowledged that a party may be bound by a collective bargaining agreement by his course of conduct. They objected vehemently to another sentence that appeared in the government's proposed instruction, which read as follows: "Even after a collective bargaining agreement expires, an employer has a duty to bargain in good faith and maintain the status quo as to wages and working conditions until a new agreement or impasse is reached." The court initially adopted that sentence as part of the instructions. Before the closings, however, the court had second thoughts.

16

Ultimately, the court concluded that Defendants were correct in their assertions that, to the extent the challenged language appeared to impose requirements of ERISA substantive law, that language effectively amended the indictment. Accordingly, before closing arguments began, the court advised the parties that the language suggesting that the Zerths had a "duty to bargain in good faith and maintain the status quo" would be stricken from the instruction. As noted above, the instruction as given stated only that a party may be bound by a collective agreement by his or her course of conduct, a statement that Defendants acknowledged was an accurate statement of the law. The language imposing on the government the burden to prove the existence of the agreement and the defendants' knowledge of their obligations under it is also accurate and did not prejudice the Zerths.

Jury instructions will be upheld "as long as . . . on the whole [they] are a fair and accurate summary of the relevant law." *Moore*, 363 F.3d at 639. The Zerths have not made any showing here that the instruction given at trial was unfair or an inaccurate statement of the law. Nor have they provided any basis for concluding that the court erred in refusing to give their proposed instruction. *See United States v. Valencia*, 907 F.2d 671, 681 n.11 (7th Cir. 1990) ("the [trial] court need not give a proposed instruction if the essential points are covered by those that are given") (internal quotations omitted). Thus, the Zerths are not entitled to a new trial.

## CONCLUSION

For the reasons stated above, the Zerths' Motion for Judgment of Acquittal (Docket Nos. 46-1, 48-1, 56-1) and Motion for New Trial (Docket Nos. 56-2) are both denied.

ENTER:

Dated: November 24, 2004

REBECCA R. PALLMEYER
United States District Judge